This matter has been before the court in various aspects since 1923. It came originally before Vice-Chancellor Foster, who appointed the receiver and made various orders in the matter. On his death the unfinished case was referred to me. It is unnecessary to set forth the various steps in the litigation as it has been several times before this court and the court of errors and appeals, and the opinions are reported which detail its history
The question now before me is practically the construction of an agreement made on December 12th, 1923, with the sanction of Vice-Chancellor Foster, between the Lawshane *Page 255 
Company, George W. Lawrence and the Lakewood Trust Company, the owner and holder of a claim against, and the owner and holder of a mortgage on the property, and Shane, whereby it was agreed that Shane purchase the property for the sum of $375,000, $10,000 of which was to be paid upon the execution of the agreement, $40,000 on May 1st, 1924, and the balance subject to two mortgages aggregating not exceeding $325,000; that Shane was to take immediate possession of the property, operate the same and pay interest on the first and second mortgages, until May 1st, 1924, with a provision for taxes and insurance. Shane also agreed to pay $10,000 —
"to the Lakewood Trust Company, which is to be used in payment of any and all indebtedness upon notes made, executed or endorsed by Mrs. Sima Elisberg, which said notes are now held by the Lakewood Trust Company and to be delivered upon payment of the aforementioned sum, payable $5,000 on February 26th, 1924, and $5,000 on April 30th, 1924;"
that a deed was to be delivered to Shane upon the payment by him of $40,000 on May 1st, 1924, passing title to the property subject to the two mortgages aggregating $325,000. The agreement contained other provisions, including the following:
"That upon delivery of the aforesaid instruments and the full performance of this contract all actions brought by Sima Elisberg against Lakewood Trust Company and George W. Lawrence or Lawshane Company shall be discontinued, and all actions brought by Lakewood Trust Company shall be discontinued and that releases be exchanged between all the parties to this agreement and Sima Elisberg. * * *
"It is further agreed that in the event that L. Barth Son or the assignee of the mortgage executed to L. Barth Son refuses to accept $25,000 out of the $50,000 purchase price herein mentioned and discontinue his foreclosure suit of his said mortgage, in part payment of the second mortgage, and to issue to the Lakewood Trust Company a participating certificate to the extent of $25,000 in said second mortgage, on or before May 1st, 1924, this contract shall be at an end and the Lakewood Trust Company shall return to Louis S. Shane the said sum of $10,000 hereinabove first mentioned, the title to all chattels said Shane may bring to the hotel shall remain undetermined and unaffected by their return to the hotel. *Page 256 
"Said Louis S. Shane further agrees to give to the Lakewood Trust Company one-half of any and all profits arising out of the operation of said hotel from date to May 1st, 1924, inclusive, provided title shall not pass as aforesaid.
"Any valid unsecured indebtedness now existing against the Lawshane Company, Incorporated, and, if necessary, established in a legal way that shall be proven before the receiver within the time limited by law shall be paid by the Lakewood Trust Company."
Shane paid to the Lakewood Trust Company the down payment of $10,000, and later made the two payments of $5,000 each, receiving at the same time promissory notes of Sima Elisberg, at the dates named, aggregating $73,533.29. These notes were endorsed by Mrs. Elisberg and were collectible.
Shortly after Shane refused to carry out the agreement, an audit of his books was made, showing that he had profited to the extent of $19,370.32, and the theory upon which the petition proceeds that the Lakewood Trust Company is bound to pay that sum, or any part thereof, into court, is based upon the clause in the agreement above quoted, to the effect —
"Said Louis S. Shane further agrees to give to the Lakewood Trust Company one-half of any and all profits arising out of the operation of said hotel from date of May 1st, 1924, inclusive, provided title shall not pass as aforesaid."
It is also based upon the further supposition which is not proven, that the $20,000 ($10,000 down payment and two $5,000 payments in consideration of the surrender of the Elisberg notes) came out of, or were proceeds of the profits that Shane made in operating the hotel. This, however, is unsupported. The evidence shows that the only money the Lakewood Trust Company ever received from Shane was $10,000, the down payment on December 15th, 1923, and the other $10,000 for the surrender of the notes, paid respectively in February and April by Shane to the Lakewood Trust Company.
The reason why the $10,000 down payment was paid to the Lakewood Trust Company was that at the time the agreement was made in accordance with the understanding between all the parties, the Lakewood Trust Company agreed *Page 257 
therefrom to pay the administration expenses, and it did, immediately after its receipt thereof, pay the receiver $4,216.45; Furst Furst, attorneys, $500; taxed costs, $22.92, and $4,745.26 insurance to protect the property. These payments were all made, pursuant to the arrangement at the time, out of moneys received from Shane, not from his profits, but before he even took possession of the hotel. The only other moneys that it received were the two payments of $5,000 each, upon the surrender of the Elisberg notes. It is impossible to restore these notes to it, or for it to ever get anything therefrom, the profits aggregating $19,370.32 were wholly received by Shane, and no part was paid to the trust company.
The agreement in its last clause provides:
"Any valid unsecured indebtedness now existing against the Lawshane Company, Incorporated, and, if necessary, established in a legal way that shall be proven before the receiver within the time limited by law shall be paid by the Lakewood Trust Company."
This, I think, was based upon the full performance of the agreement, including the taking of title on May 1st, 1924, by Shane, and paying the balance of the cash consideration of $40,000. A perusal of the agreement shows that beyond the two payments of $10,000 each by Shane, and his taking possession of the hotel pending the running of the agreement, there were several other covenants to be performed by him and others, all of which fell with his failure to take title. The agreement provided that upon the carrying out of all of these other covenants —
"and the full performance of this contract all action, c., shall be discontinued * * * and releases exchanged;"
that Lakewood Trust Company would deliver to Shane certain obligations of Mrs. Elisberg, apart from and in addition to those surrendered upon the making of the two payments of $5,000 each. There was, however, an important contingency necessary in order to enable title to pass, and that was — *Page 258 
"in the event that L. Barth Son [the holder of the earlier mortgages] refuses to accept $25,000 out of the $50,000 purchase price herein mentioned and discontinue his foreclosure suit of his said mortgage, in part payment of the second mortgage, and to issue to the Lakewood Trust Company a participating certificate to the extent of $25,000 in said second mortgage, on or before May 1st, 1924, this contract shall be at an end, and the Lakewood Trust Company shall return to Louis S. Shane the said sum of $10,000 hereinabove first mentioned."
The record shows that Barth refused to discontinue the foreclosure suit. In my opinion this brought the agreement to an end. The trust company's liability was contingent on the carrying out of all the terms of the agreement. When the agreement fell the trust company's liability ceased. I think the petition, as to it, should be dismissed, and I will so advise.